EAG:DAL/MKM/ML
F.#2011R00634

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                  11-CR-303 (S-3) (NGG)

YASSA ASHBURN,
JAMAL LAURENT,
TREVELLE MERRITT and
RALIK ODOM,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -X


MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S
MOTION TO ADMIT EVIDENCE OF OTHER ACTS


LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Darren A. LaVerne
M. Kristin Mace
Margaret Lee
Assistant U.S. Attorneys
(Of Counsel)

## Table of Contents

PRELIMINARY STATEMENT ............................................................................................. 2

BACKGROUND ............................................................................................................. 2

    I.    The Charges ........................................................................................................... 2

    II.   Overview of the Government's Evidence of Other Acts ........................................... 7

ARGUMENT ................................................................................................................ 14

    I.    Evidence of Other Acts Is Admissible to Establish the Racketeering Enterprise and Conspiracy . 15

        A.   Legal Standard ............................................................................................... 15

        B.   Analysis ......................................................................................................... 18

    II.   Evidence of Other Acts Is Directly Relevant to and Inextricably Intertwined with the Evidence of the Charged Crimes            ................................................ 19

        A.   Legal Standard ............................................................................................... 19

        B.   Analysis ......................................................................................................... 20

    III.  Evidence of the Defendants' Other Acts Is Also Admissible Pursuant to Rule 404(b) ............. 21

        A.   Legal Standard ............................................................................................... 21

        B.   Analysis ......................................................................................................... 25

    IV.  The Other Acts Evidence is Admissible Under Rule 403 ....................................... 28

CONCLUSION ............................................................................................................. 30

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in support of its

motion <u>in limine</u> to admit evidence of certain crimes and bad acts not detailed in the

indictment.  As set forth below, the evidence described herein should be admitted into

evidence at trial because it is (i) evidence of the charged racketeering enterprise; (ii) evidence

of the charged conspiracy, inextricably intertwined with evidence of the offenses in the

indictment, or necessary to complete the story of the crimes on trial; and/or (iii) admissible

pursuant to Federal Rule of Evidence 404(b).[1]

<u>BACKGROUND</u>

I.    <u>The Charges</u>

    A.    <u>The Enterprise</u>

Defendants Laurent, Ashburn, Merritt and Odom have been charged in the

third superseding indictment (the "Indictment") with racketeering, racketeering conspiracy

and related crimes committed in connection with their membership in the Six Tre Outlaw

Gangsta Disciples Folk Nation set based in Brooklyn, New York ("Six Tre Folk Nation" or

"Six Tre").  The Six Tre set is part of a nationwide gang founded in Chicago, Illinois in the

early 1990s.  The gang uses various gang signs, handshakes and symbols, including, among

others, a six-point star, an upward pointed pitchfork and the acronyms BOSS (which stands

for "Brothers of the Strong Struggle") and LOTS (which stands for "Land of the Six").

---

[1]    The government may seek to introduce at trial other acts evidence in addition
to the evidence set forth herein.  Should it seek to do so, the government will provide the
defense with notice in accordance with Rule 404(b).

The Six Tre operated in the Ebbets Field housing projects in the Flatbush area of Brooklyn for several years.  It has approximately 20-25 identified members, several of whom have been previously arrested for gang-related crimes.  From approximately 2007 through 2011, the Six Tre members were responsible for numerous acts of gang-related violence, including homicides, non-fatal shootings and commercial robberies both in and around Flatbush and elsewhere.

B.   Crimes Alleged in the Indictment

The charges in the Indictment arise from, among other things, the following:

1.   Conspiracy to Murder Members of the Crips Gang (All Defendants)

The evidence will show that during the period April 2008 to October 2011, the members of Six Tre, including the defendants, conspired to murder members of the rival Crips gang in Brooklyn.

This conduct forms the basis for Count One (Racketeering, Racketeering Act One – Conspiracy to Commit Murder in-aid-of Racketeering) and Count Two (Racketeering Conspiracy), in which all of the defendants are charged.

2.   The April 20, 2008 Murder of Courtney Robinson (Defendant Ashburn)

On April 20, 2008, at approximately 10:30 p.m., Courtney Robinson was shot and killed during a party held at an apartment in the Ebbets Field housing project and attended by several Six Tre members.  During the party, a fight broke out between a Six Tre member and another individual.   In the course of the fight, defendant Ashburn retrieved a 9-millimeter handgun from a location in the building's stairwell where Six Tre members stored

3

their weapons.  He returned to the apartment and shot Robinson once in the back, killing him.

This conduct forms the basis for Count One (Racketeering, Racketeering Act Two – Murder), Count Two (Racketeering Conspiracy), Count Four (Murder in-aid-of Racketeering) and Count Five (Unlawful Use of a Firearm), in which defendant Ashburn is named.

3.    The September 13, 2008 Attempted Murder of "Wrinkles" (Defendant Odom)

On September 13, 2008, a Six Tre member reported to Devon Rodney that the leader of a rival gang, who went by the street name "Wrinkles," had been spotted at a block party near Ebbets Field.  Rodney dispatched defendant Odom and another Six Tre member to shoot the rival.  In attempting to do so, the Six Tre member with Odom fired several shots into a group of people.  One of those bullets hit the neck of a 10-year old girl, who was taken to the hospital, where she recovered from her injuries.

This conduct forms the basis for Count One (Racketeering, Racketeering Act Four – Attempted Murder), Count Two (Racketeering Conspiracy), Count Twelve (Assault with a Dangerous Weapon in-aid-of Racketeering) and Count Thirteen (Unlawful Use of a Firearm), in which defendant Odom is charged.

4.    The June 19, 2010 Murder Of Brent Duncan (Defendant Laurent)

On June 19, 2010, Laurent shot Brent Duncan on the street outside a house party that the two men had attended.  Duncan died at the scene.  The evidence will show that Laurent shot Duncan because he believed Duncan to be a member of the rival Crips street

gang and thought that Duncan had displayed a Crip hand sign at the party. None of

Duncan's friends or family, however, knew him to have any association with the Crips.

        This conduct forms the basis for Count One (Racketeering, Racketeering

Act Nine – Murder), Count Two (Racketeering Conspiracy), Count Eight (Murder in-aid-of

Racketeering) and Count Nine (Unlawful use of a Firearm), in which defendant Laurent is

charged.

       5.    <u>The July 7, 2010 Shooting Of John Doe #3 (Defendant Laurent)</u>

        On July 7, 2010, a Crips member referred to in the Indictment as John Doe #3,

was shot by Laurent as he walked home. Laurent pretended to know John Doe #3, greeted

him and gave him a fist pump. The evidence will show that after John Doe #3 walked by,

Laurent turned around, removed a gun from his waistband, and shot John Doe #3 twice in the

back. After he was hospitalized, John Doe #3 recovered from his injuries.

        This conduct forms the basis for Count One (Racketeering, Racketeering Act

Twelve – Attempted Murder), Count Two (Racketeering Conspiracy), Count Ten (Assault

with a Dangerous Weapon in-aid-of Racketeering) and Count Eleven (Unlawful Use of a

Firearm), in which defendant Laurent is charged.

       6.    <u>The January 28, 2011 Murder Of Dasta James (Defendant Merritt)</u>

        On January 28, 2011, defendant Merritt conspired with defendant Laurent to

rob Dasta James, from whom Merritt had planned to purchase marijuana. During the course

of the transaction, Merritt purchased a small quantity of marijuana from James and then

stepped away, claiming he was going to urinate in the stairwell. At that point, Laurent pulled

out his weapon and demanded that James give him everything in his possession. James

refused and the two began fighting.  Laurent then shot James while James was running away from him and calling for help.  Merritt and Laurent then ran down the stairs to the lobby and exited through the building's garage.

This conduct forms the basis for Count One (Racketeering, Racketeering Act Sixteen – Attempted Robbery and Murder), Count Two (Racketeering Conspiracy), Count Nineteen (Hobbs Act Robbery), Count Twenty (Unlawful Use of a Firearm) and Count Twenty One (Causing Death through Use of a Firearm), in which defendant Merritt is charged.

### 7.   The Jewelry Store Robberies (Defendants Odom and Laurent)

The evidence will show that defendants Odom and Laurent conspired with others, including other members of Six Tre, to commit, and did commit, smash-and-grab robberies of high-end jewelry stores in Manhattan, New Jersey, Connecticut and Massachusetts, during which the conspirators entered the stores, smashed the display cases with a sledgehammer and grabbed merchandise from the cases.

This conduct forms the basis for Count One (Racketeering, Racketeering Act Seven – Hobbs Act Robbery Conspiracy), Count Two (Racketeering Conspiracy) and Count Sixteen (Hobbs Act Robbery Conspiracy).

### 8.   Craigslist Robberies (Defendant Laurent)

The evidence will show that defendant Laurent also conspired with others, including other members of Six Tre, to commit, and did commit, a series of robberies of individuals solicited via the Craigslist website.

This conduct forms this basis for Count One (Racketeering, Racketeering Act Ten – Hobbs Act Robbery Conspiracy; Racketeering Act Eleven – Hobbs Act Robbery; Racketeering Act Thirteen – Hobbs Act Robbery; Racketeering Act Fourteen – Hobbs Act Robbery, Count Two (Racketeering Conspiracy), Count Seventeen (Hobbs Act Robbery Conspiracy) and Count Eighteen (Unlawful Use of a Firearm), in which defendant Laurent is charged.

## II.   Overview of the Government's Evidence of Other Acts

The government anticipates that, in the course of presenting its case-in-chief, it will seek to offer at trial the following categories of evidence of other acts.

### A.   The Founding of Six Tre and Prior Gang Affiliation

Cooperating Witness #1 ("CW-1"), a former Six Tre member who is now a cooperating witness, is expected to testify about the founding of the gang by an individual referred to as "Gangsta A" and defendant Ashburn.[2]  Prior to founding Six Tre, Ashburn was a member of a local gang referred to as "2 – 1st."  Upon the founding of the Six Tre set in the Flatbush area of Brooklyn, Ashburn brought many of the 2 – 1st members with him to become members of the Six Tre Folk Nation.

CW-1 is further expected to testify that several younger members of Six Tre began their involvement in criminal conduct as members of other gangs.  It was not uncommon for young boys to join or form a gang to attract the attention of, and establish a

---

[2]     CW-1 has pleaded guilty to an information charging him with racketeering, with predicate acts of marijuana distribution and conspiracy to commit murder and robbery; racketeering conspiracy; conspiracy to commit murder; and using a firearm during a crime of violence.  CW-1 has entered into a cooperation agreement with the government in the hope of receiving leniency at sentencing.

reputation among, Six Tre members.  Once the boys reached a certain age many graduated to become full members of the Six Tre Folk Nation.  For example, defendant Merritt and CW-1 were both members of a gang referred to as "Tre Six," whose members sought to develop a reputation among the older inducted members of the Six Tre Folk Nation.

Cooperating Witness #2 ("CW-2"), a former close criminal associate of defendant Laurent, is expected to testify that defendant Laurent was a member of the Crips gang before becoming a Six Tre member.[3]  Cooperating Witness #3 ("CW-3"), another former associate of Laurent's, is also expected to testify that Laurent used to be a Crips member.[4]

B.    Assaults

CW-1 is expected to testify that assaults were common, both among young men seeking Six Tre membership and among inducted Six Tre members.  Committing assaults was a way to establish a street reputation that would lead to respect and Six Tre membership, or increased status within the gang.  For example, when defendant Ashburn was approximately 18 years old and already a Six Tre member, he assaulted a young boy of approximately 13 or 14 years of age who had spit on Ashburn.  The assault, which occurred in front of multiple Ebbets Field residents including CW-1, resulted in the young boy being

---

[3]    CW-2 has pleaded guilty to an information charging him with Hobbs Act robbery conspiracy and use of a firearm during a crime of violence.  He has entered into a cooperation agreement with the government in the hope of receiving leniency at sentencing.

[4]    CW-3 has pleaded guilty to an information charging him with bank fraud and unauthorized use of identification documents.  He has entered into a cooperation agreement with the government in the hope of receiving leniency at sentencing.

severely beaten.  Ashburn repeatedly thrust an umbrella into the boy's mouth such that the boy bled profusely and appeared to have his teeth broken.  CW-1 is expected to testify that this enhanced Ashburn's reputation as a dominant force in the neighborhood and someone capable of committing violence.

Similarly, CW-1 is expected to testify that defendant Merritt committed multiple assaults so as to enhance his reputation.  For example, when Merritt was approximately 15 years old, he punched a member of the Bloods gang in a skating rink and knocked him out.  Then over the next few years, Merritt and CW-1 would sometimes pick out innocent passersby and beat them without provocation.  These assaults served to enhance Merritt's reputation – a pattern that continued after Merritt's formal induction into the gang.  For example, during the summer of 2008, CW-1, Merritt and other Six Tre members fought with members of a rival Crips set, which used the name "Eight Tre."  On another occasion, Six Tre members beat an individual whom they believed belonged to a "fake" Folk Nation set.  Later, on approximately October 31, 2008, Merritt and another Six Tre member punched two innocent people on the street without provocation.

CW-1 is also expected to testify to other assaults by the Six Tre members against innocent civilians who were not affiliated with any gang.  For example, on April 20, 2008, CW-1, along with other Six Tre members, violently assaulted Courtney Robinson shortly before he was shot and killed by defendant Ashburn, as alleged in Racketeering Act Two.

The government will also present other evidence of the use of physical violence among Six Tre members in connection with efforts to further the gang's criminal

objectives, increase or maintain status and position within the gang or to penalize disfavored conduct.   For example, CW-1 is expected to testify that he witnessed defendant Ashburn fighting with Devon Rodney, also known as "D-Bloc," who was ascending within the Six Tre ranks.  Ashburn, who had been the clear leader of the gang, received less respect and his authority diminished after Rodney got the better of the fight.  Similarly, when Six Tre members engaged in disfavored conduct, they were sometimes "violated," meaning they were beaten by other Six Tre members.

  C. <u>Shootings, Murders and Murder Conspiracies</u>

    The government's evidence at trial will show that the violence of the Six Tre Folk Nation resulted not only in assaults but also in shootings and murders.  The government anticipates proving this through the acts that make up the racketeering pattern described in the Indictment (including those in which none of the remaining defendants are specifically named) as well as other shootings and murders.

    First, the government anticipates proving at trial that a 9-millimeter Smith and Wesson semi-automatic firearm and ammunition were recovered from Laurent's room on June 22, 2010, and that the firearm was fired by Laurent earlier that day.  Ballistics testing on this firearm confirmed that it was the murder weapon used in the June 19, 2010 killing of Brent Duncan, as alleged in Racketeering Act 9, in which Laurent is named.  Ballistics testing further revealed that the gun was also used in a homicide on June 20, 2010, one day before it was recovered from Laurent's room.   The government will seek to introduce various types of evidence establishing these facts, including ballistics evidence, witness testimony, photographs and records establishing the shootings and murders.

Second, although Laurent is not named in the Racketeering Act Sixteen, which alleges the murder of Dasta James, the government will seek to introduce evidence of his participation in the murder through surveillance video, cell phone records and historical cell-site data.

Third, CW-1 is expected to testify that in August 2008, he was present when a Six Tre member reported to a group of other members that he had been robbed.  A large group of Six Tre members, which included then-leader Devon Rodney and Merritt, set off looking for the perpetrator.  Later that day, the Six Tre member, who had been robbed, shot and killed "KO" on a rooftop of the Flatbush Gardens apartments.  The government will present other evidence to corroborate CW-1's testimony, including ballistics evidence and photographs and records establishing the fact of the August 23, 2008 murder and the manner in which was carried out.

Finally, the government will offer evidence of Six Tre's ongoing conspiracy to attack and kill members of rival gangs.  For example, CW-2 is expected to testify that, in the earlier days of Six Tre, the dominant gang in the Flatbush neighborhood was another Folk Nation set known as the "Seven Four" set, until its leader "Ra Ra" was murdered. Thereafter, Six Tre assumed dominance.  CW-1 is expected to testify about numerous shootings that he witnessed and/or was informed about by other Six Tre members, which involved Six Tre members challenging members of rival gangs, including shootings of "Gemini" in August 2008, "Windel" in September 2008, "Lorenzo" in December 2008, and a shooting by co-defendant Geraldo Elainor (also known as "Gunny") at Bloods members at a basement party in Canarsie.  The government also anticipates that CW-2 will testify that,

after the shooting of John Doe #3 on July 7, 2010, Laurent and fellow Six Tre member and

co-defendant Ricky Hollenquest shot at a Crip member simply because he was a Crip.

D.   Sales, Purchases and Possession of Firearms

The government anticipates proving at trial that the above-described violence

was facilitated by Six Tre's purchase of guns for use by its members, who were often in

possession of these Six Tre guns or their own individually purchased guns.  For example,

CW-1 is expected to testify that Six Tre members informed him that fellow Six Tre member

Anthony "Coog" Williams would purchase guns somewhere in the southern United States

and would bring them back to New York for Six Tre use.  Other guns were purchased for Six

Tre from a Crip member named "Nori."  Such guns would often be stored in a communal

location where Six Tre members could gain easy access to them when necessary.  One such

location was a storage room on the eighth floor of 11 McKeever Place next to Merritt's

apartment.  Another location was in the building at 1700 Bedford Avenue near the apartment

where Courtney Robinson was murdered on April 20, 2008.

Some Six Tre members not only had access to the gang's guns but also kept

their own guns.  For example, CW-1 is expected to testify that Odom had his own gun, which

he stole from a member of a different Folk set, Six Tre member "Coog" sold crack cocaine

and carried a gun, and Six Tre member Daniel Harrison kept a gun in his apartment and sold

marijuana and crack cocaine.

At times, Six Tre members who owned guns would call upon fellow Six Tre

members to hold their guns.  CW-2 is expected to testify that he observed Laurent storing

marijuana and guns for Rodney.  Laurent, in turn, once asked CW-2 to hold a gun for him

after the police had visited Laurent's home.  On another occasion, Laurent told CW-2 that he

had given a gun to Six Tre member Ricky Hollenquest when Laurent was incarcerated.

CW-3 is expected to testify that Laurent "always" carried a gun in his

waistband and would sell guns to people in the neighborhood.  On one occasion, however, an

individual named "KB" gave Laurent $300 to buy a .32 caliber handgun.  Laurent took the

$300, but never provided the gun.

E.      Thefts and Robberies

CW-1 is expected to testify that thefts and robberies were also common among

Six Tre members and was an important way in which gang members "earned" money for

themselves and the enterprise.  For example, Six Tre members robbed jewelry stores and

stole credit card numbers.  In addition, CW-1 is expected to testify that CW-1, Merritt and

other Six Tre members would steal cell phones from people walking down the street and

resell them for cash.  As one example of this, the government will seek to introduce witness

testimony that, on or about January 12, 2011, Merritt and another individual robbed a victim

of his cellphone while indicating that they had a gun.  In addition, the government will seek

to introduce evidence through witness testimony and physical evidence of Laurent's

commission of an armed robbery on March 21, 2011.  CW-3 is expected to testify that

Laurent told him about his involvement in jewelry store robberies and was upset that people

were talking about the robberies.

F.      Narcotics Use and Sales

The government anticipates presenting evidence that Six Tre members

frequently bought, sold and used narcotics.  Specifically, CW-1 is expected to testify that he,

13

Ashburn and Merritt smoked marijuana and CW-2 is expected to testify that he and Laurent smoked marijuana. In addition, CW-1 is expected to testify that Six Tre members often sold drugs to earn money for themselves and for the gang. CW-1 and Merritt, for example, sold marijuana and sometimes contributed a portion of the proceeds to the Six Tre coffers, as did other Six Tre members. CW-2 is expected to testify that Laurent sold marijuana and was sometimes in possession of large quantities of the drug. For example, in approximately 2010, CW-2 observed Devon Rodney and Laurent at Laurent's mother's home with multiple pounds of marijuana, two to three guns and a couple thousand dollars in cash. Laurent reported to CW-2 that the money and marijuana were his.

<u>ARGUMENT</u>

All of the "other act" evidence identified above is direct proof of the racketeering enterprise described in the indictment, and much of it is also directly relevant to and inextricably intertwined with the evidence of the charged crimes. As such, it does not constitute "crime[s], wrong[s], or other act[s]" subject to Federal Rule of Evidence 404(b). Nevertheless, even if it were to constitute such evidence, it is admissible under Rule 404(b) to show knowledge, intent, identity and the absence of mistake, while also providing background of the conspiracy, explaining the relationship of trust between the coconspirators and completing the story of the charged crimes. Finally, all of the evidence identified above passes Rule 403's balancing test.

14

I.      Evidence of Other Acts Is Admissible to Establish the Racketeering Enterprise
        and Conspiracy

        A.      Legal Standard

        The Second Circuit has repeatedly held that evidence of "other" or

"uncharged" crimes is admissible to establish the existence of the enterprise and conspiracy

in prosecutions for racketeering offenses and other conspiracies.  For example, in United

States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003), the Second Circuit affirmed a district court's

admission of sixteen robberies not alleged in the indictment, finding that "[i]t is well settled

that in prosecutions for racketeering offenses, the government may introduce evidence of

uncharged offenses to establish the existence of the criminal enterprise."  Moreover, a

criminal act committed in furtherance of the alleged conspiracy is "not an 'other act' within

the meaning of Rule 404(b); rather, [it is] part of the very act charged."  United States v.

Concepcion, 983 F.2d 369, 392 (2d Cir. 1992).  Thus, crimes committed in furtherance of the

racketeering enterprise do not fall within the ambit of Rule 404(b).  See United States v.

DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to

prove relationship and continuity of RICO enterprise's illegal activities).

        In United States v. Wong, 40 F.3d 1347 (2d Cir. 1994), a case in which the

defendants were charged with committing crimes in the course of their association with the

Green Dragons gang, the Second Circuit held that the district court properly admitted

testimony of a shootout between rival gangs not specifically charged in the indictment.  In

this regard, the Second Circuit found that "the evidence [of uncharged acts] was admissible

to prove the existence and nature of the Green Dragons 'enterprise' and the participation of

15

defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b)." Id. at 1378.  The court further held that "this evidence was probative of the existence, organization and nature of the RICO enterprise, a central allegation in the indictment." Id.  Accordingly, "'the fact that it may also have been probative of a separate uncharged crime is irrelevant.'" Id. (quoting United States v. Coiro, 922 F.2d 1008, 1016 (2d Cir. 1991)).[5]

Similarly, in United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999), the Second Circuit affirmed the admission of numerous uncharged criminal acts admitted as "enterprise evidence," i.e., to establish the existence of the charged enterprise, including evidence of drug trafficking, possession of weapons, assaults in aid of racketeering, robbery and related acts of violence.   The court held that this evidence was not subject to Rule 404(b).   Id.

In United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997), the Second Circuit affirmed the district court's decision to admit evidence of uncharged murders as proof of a RICO enterprise and conspiracy, rather that pursuant to Rule 404(b).  Id. ("The district court concluded that the proof of these murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice.  Such an assessment is reviewable only for abuse of discretion, and we see no abuse of discretion here."  (citations omitted)).  See also United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007) (upholding the admission of uncharged murders to prove the existence of the Gambino family); United

---

[5]      The court further found that the district court acted well within its discretion in concluding the evidence was admissible under Rules 401 and 403.

States v. Mejia, 545 F.3d 179, 206–07 (2d Cir. 2008) (upholding the admission of evidence of a prior uncharged shooting because the it demonstrated the existence of the racketeering enterprise and the existence of the conspiracy with which the defendants were charged).

Evidence of "other" or "uncharged" crimes is particularly relevant in this case, where the defendants are charged with racketeering conspiracy.  To convict a defendant of RICO conspiracy, the government must prove (1) the existence of a criminal enterprise, (2) the enterprise affected interstate commerce, (3) the defendant associated with the enterprise, and (4) the defendant knowingly conspired to conduct or participate, directly and indirectly, in the conduct of affairs of the enterprise through a pattern of racketeering. 18 U.S.C. §§ 1962(c) and (d).  As the Second Circuit explained in United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009), a racketeering conspiracy is not a conspiracy to commit two or more predicate acts, because "it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but [r]ather, the combination of these two elements[.]"  Id. at 463 (citation and internal quotation marks omitted).  In addition, "to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern[.]"  Id. at 465 (emphasis added; citation and internal quotation marks omitted).

Thus, as the Second Circuit explained in United States v. Basciano:

[W]here racketeering is the charge, the jury is entitled to rely not only on evidence of the defendant's own crimes, but also on evidence of the crimes of those with whom he is alleged to have thrown in his lot because the judgment required is not simply what acts the defendant committed at particular moments, but

17

> whether those acts were parts of a pattern, i.e., committed as part of [the] defendant[s'] association with a subculture of crime.

599 F.3d 184 at 207 n.17 (2d Cir. 2010) (internal quotation marks and citations omitted).

B.    <u>Analysis</u>

Evidence of the above-described "other" criminal acts is central to proving the existence and nature of the enterprise – the Six Tre Folk Nation – and the enterprise's involvement in racketeering activity; the activities, purpose and means of the charged enterprise; that the alleged predicate racketeering acts constitute a "pattern of racketeering activity"; the defendants' respective positions within Six Tre; the Six Tre's effect on interstate commerce; and the history and relationships between the defendants and cooperating witnesses.

For example:

<u>Prestige and Reputation</u>:  Evidence of Six Tre members' use of violence against rival gang members establishes the way in which the Six Tre Folk Nation achieved one of its purposes of "[p]romoting and enhancing the prestige, reputation and position of the enterprise with respect to rival criminal organizations."  (Indictment ¶ 4(a)).

<u>Preservation of Power Through Violence</u>:  Evidence of the numerous firearms purchased and possessed, assaults, shootings and murders committed by Six Tre members against members of other gangs as well as members of the public in Six Tre's territory demonstrates some of the key ways in which the enterprise sought to achieve its purposes of "[p]reserving and protecting the power, territory and criminal ventures of the enterprise through the use of intimidation, threats of violence and acts of  violence, including assaults and murders" and "keeping victims and rivals in fear of the enterprise and its members and associates."  (Indictment ¶¶ 4(b) and (c)).

<u>Financial Enrichment</u>:  Evidence of Six Tre members engaging in thefts and robberies, as well as selling narcotics demonstrates the ways in which the enterprise achieved its purpose of "[e]nriching the members and associates of

18

the enterprise through criminal activity, including robbery."  (Indictment ¶ 4(d).

<u>Interstate Commerce</u>:  Evidence of robberies of jewelry stores by Six Tre members of luxury watches, as well as the distribution of narcotics, is also relevant to the government's proof of the effect of the enterprise on interstate commerce.

Evidence of each of the crimes described above shows the defendants' commitment to engaging in an ongoing and extensive pattern of using violence and committing crimes to make money.  <u>See</u> <u>Pizzonia</u>, 577 F.3d at 465 ("[T]he threat of continued criminal activity over an open period can be established where discrete predicates can be attributed to a defendant operating as part of a long-term association that exists for a criminal purpose.").  Taken together, these other acts plainly manifest the "continuity required to prove a pattern" that is required to prove the existence of, and the defendants participation in, the racketeering enterprise and conspiracy.  <u>Id.</u>

Separately, certain acts described above – for example, the efforts of various Six Tre members to shoot members of the Crips gang – are direct proof the murder conspiracy charged in Racketeering Act One.

II.    Evidence of Other Acts Is Directly Relevant to and Inextricably Intertwined with the <u>Evidence of the Charged Crimes</u>

A.    <u>Legal Standard</u>

It is well settled that, where evidence of "other acts" is inextricably intertwined with evidence of the charged crimes, the Second Circuit has held that such evidence is admissible without regard to Rule 404(b).  <u>See, e.g.</u>, <u>United States v. Gonzalez</u>, 110 F.3d 936, 941–42 (2d Cir. 1997); <u>United States v. Thai</u>, 29 F.3d 785, 812 (2d Cir. 1994).

19

In Gonzalez, for example, the defendants were charged with being felons in possession of firearms.  The Second Circuit affirmed the admission of evidence at trial of a burglary because it was relevant to both motive for defendants' possession of the firearms and to provide "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of the defendants' arrest.  110 F.3d at 942.  In rejecting the defendants' claim to preclude this evidence pursuant to Rule 404(b), the court held:

> It is well established that "evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'"

Id. (quoting United States v. Towne, 870 F.2d 880, 886 (2d. Cir. 1989) (emphasis added) (alteration in original)).  Thus, the evidence of the burglary was admitted as relevant under Rule 401, after a Rule 403 determination that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice.[6]

B.    Analysis

Evidence of many of the other acts described above is "necessary to complete the story of the crime on trial," Carboni, 204 F.3d at 44, because this evidence explains how the enterprise was founded, how the defendants became members of the enterprise, and how

---

[6]    The court in Gonzalez further noted that "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  110 F.3d at 941.  Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime."  Id.; see also Fed. R. Evid. 401, 402.  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).

the defendants and their coconspirators operated as members of the Six Tre Folk Nation.  For example, the evidence of prior gang membership by Ashburn, Merritt and Laurent, as well as the evidence of the assault by Ashburn in the early days of the Six Tre Folk Nation and the assaults by Merritt when he was positioning himself to become a Six Tre member, is important to demonstrate how the enterprise established dominance in the neighborhood and how its members, particularly the defendants, were selected for membership.  The robberies, guns, narcotics sales, assaults, shootings and murders by other inducted Six Tre members further demonstrate how the defendants and their coconspirators operated within Six Tre and worked to achieve the purposes of the enterprise.

The foregoing evidence is also inextricably intertwined with the government's proof of the racketeering conspiracy inasmuch as it helps explain how each defendant came to be a member of the enterprise and his relative role within the enterprise.  Said another way, the evidence is crucial to the government's ability to prove the "evidentiary richness" and "narrative integrity" the Supreme Court described in <u>Old Chief</u> that will allow the jury to understand how Six Tre established a presence in the Flatbush neighborhood and utilized the means and methods of the enterprise to accomplish its goals.

III.    <u>Evidence of the Defendants' Other Acts Is Also Admissible Pursuant to Rule 404(b)</u>

In the alternative, the government seeks to admit the evidence described above pursuant to Federal Rule of Evidence 404(b).

A.    <u>Legal Standard</u>

In general, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such evidence, however, "may be

admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). While the government "must explain in detail the purposes for which the evidence is sought to be admitted," United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) (citing United States v. O'Connor, 580 F.2d 38, 40 (2d Cir. 1978)), the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application: "We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible." Id.

The Second Circuit has identified three prerequisites for the admission of "other crimes" evidence under Rule 404(b). First, a trial court must determine whether the evidence is offered for a purpose other than to prove a defendant's bad character or criminal propensity. It is clearly established that a proper purpose includes acts to explain the coconspirators' relationship of trust, the extent of the illegal relationship between the defendant(s) and their coconspirators, as well as motive, opportunity and intent. See, e.g., United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that defendant's relationship with coconspirator over a lengthy period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the

two [conspirators] developed and to explain why [one conspirator] . . . appointed [the defendant] to a leading position in the Organization"); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

Second, the trial court must determine whether the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence and whether its probative value is not substantially outweighed by the danger of unfair prejudice under Rule 403. See Pitre, 960 F.2d at 1119; United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991). Third, the court must provide an appropriate limiting instruction to the jury, if one is requested. See Pitre, 960 F.2d at 1119.

As noted, courts have held that one proper purpose for the admission of other acts evidence is to prove a relationship of trust between conspirators in a charged conspiracy, as well as knowledge and intent with regard to the charged crime. For example, in United States v. Williams, 205 F.3d 23, 33–34 (2d Cir. 2000), the Second Circuit considered whether  the district court, during a trial on cocaine trafficking charges, had properly admitted, pursuant to Rule 404(b), evidence of the defendant's prior criminal dealings with his coconspirators. The Second Circuit upheld the admission of evidence of the defendant's involvement in marijuana distribution, credit card fraud and filing false charges of assault with two coconspirators involved in the charged conspiracy to distribute cocaine. Id. In doing so, the court held that "evidence of [the defendant's] prior criminal conduct with his coconspirators was relevant to 'inform the jury of the background of the conspiracy charged,

23

to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" Id.

Similarly, in Pipola, the district court ruled, prior to trial, that the government could introduce at the defendant's trial on robbery and related firearms charges evidence of the defendant's involvement in other bad acts with his coconspirators, who later became cooperating witnesses for the government and were expected to testify at trial. 83 F.3d at 565. Significantly, the Second Circuit affirmed the Court's ruling that evidence of prior (1) loans and debt collections, (2) armed robberies and burglaries, and (3) using and selling stolen counterfeit credit cards, was relevant as background information to make the story of the charged crimes complete and to enable the jury to understand how the illegal relationship between the coconspirators developed. Id. at 566; see also Rosa, 11 F.3d at 334.

In addition, to the extent that evidence of an uncharged crime includes an inculpatory admission by a cooperating witness who participated in the uncharged crime jointly with a defendant, such evidence is admissible to corroborate the witness's testimony. See United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987); United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994). It is required that the proponent of the evidence demonstrate a close relationship between the proffered evidence and the evidence to be corroborated; thus the corroboration must be direct and the matter significant. Everett, 825 F.2d at 660. In Everett, for example, the government had only one significant witness to the charged crime, whose credibility, because of his past convictions and involvement in the charged crime, was attacked. Id. at 661. The Circuit upheld the admission of corroborating other act evidence because it provided "important" details and corroboration of the charged crime and reinforced the testimony of the government witness. Id

24

Finally, evidence of other crimes must also be analyzed under Rule 403, but is admissible so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crime[] with which [the defendant has been] charged.'"  Pitre, 960 F.2d at 1120 (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)).  Where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Rule 403 balancing test.  United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force with an arrestee, choked another arrestee, on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction"); United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (prior cocaine convictions admissible as proof that the defendant was aware that substance in his closet was cocaine; observing that evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice where the evidence does not "involve conduct more inflammatory than the charged crime[s]").  Even where there is a risk of undue prejudice, such risk can be mitigated effectively by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  See Mickens, 926 F.2d at 1329.

 B. Analysis

  Here, the government offers evidence of the defendants' participation in uncharged acts not to show propensity but rather as relevant background to demonstrate how the "illegal relationship" among the defendants and their coconspirators was formed and developed.  Rosa, 11 F.3d at 333–34.  Many of these acts – e.g., crimes committed by the defendants with each other or one of the cooperating witnesses – provide important

background of the conspiracy, explain the relationship of trust among coconspirators and enable the jury to understand the complete story of the charged crimes.  This is particularly true given the multi-year criminal associations of some of the cooperating witnesses with the defendants.  The story of how the cooperating witnesses came to know the defendants, commit crimes with them and earn their trust such that they would confide in them about their own crimes – and how the cooperating witnesses came to know and commit crimes with other members of Six Tre who, too, would confide in them about criminal matters regarding the enterprise, including the defendants' crimes – cannot be told without testimony about the defendants' uncharged crimes and other acts.   Testimony and other evidence of these acts will serve to corroborate testimony by the cooperating witnesses that they were close criminal associates with the defendants, and thereby corroborate their testimony regarding the defendants' involvement in the charged crimes.[7]  For example, the government will corroborate CW-1's testimony about the August 23, 2008 murder referenced herein with witness testimony and crime scene evidence.

In addition, some of the other acts will tend to prove that the defendants possessed the requisite intent and state of mind during their participation in the entire racketeering conspiracy.  See United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993).

---

[7]     The government is also permitted to elicit other acts evidence from a cooperating witness insofar as those acts constitute impeachment material that the witness may be cross-examined about by the defense.  See, e.g., United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("[S]ince the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility.  In this manner, the prosecution was able to avoid the appearance that it was concealing impeachment evidence from the jury.").  Thus, for this additional reason, the cooperating witnesses should be permitted to testify about gang activity or other crimes they engaged in with the defendants.

In light of the uncharged crimes and other acts set forth above, it is less likely that the defendants did not possess the requisite intent and knowledge, or had some other state of mind consistent with innocent association, during their participation in the racketeering conspiracy.   See Zackson, 12 F.3d at 1182 (holding that evidence that the defendant had previously engaged in narcotics trafficking with his coconspirator was admissible to rebut the defendant's defense of innocent association).   Because the defendants' knowledge and intent are elements of the charged offenses, and thus facts of "consequence" at trial, see Fed. R. Evid. 401, the government should be given the opportunity to prove those elements with relevant evidence, including the evidence of the uncharged crimes and other acts.

Furthermore, the evidence of the defendants' other conduct tends to establish their knowledge and intent with respect to the charged crimes and is probative of the absence of mistake, among other things, with respect to the charged racketeering acts.   For example, Merritt's repeated acts of violence and participation in Six Tre activity in which guns are used tends to establish his knowledge and intent with respect to the use of violence and threats of violence, and is thus probative of the absence of mistake with respect to his participation in the robbery and murder of Dasta James, as charged in Racketeering Act Sixteen.   See Pitre, 960 F.2d at 1120 (evidence of other acts evidence admissible to undercut claim that defendants were present at crime scene without intent to participate in narcotics conspiracy); see also United States v. Klein, 340 F.2d 547, 549 (2d Cir. 1965) (where "the evidence is susceptible of the interpretation that the acts alleged to constitute the crime were innocently performed and the vital issues of knowledge and intent are keenly disputed, it is well within the trial judge's discretion to permit the Government, on a properly limited basis, to introduce evidence of prior similar offenses demonstrating the unlikelihood that the

27

defendant was a mere innocent, unknowing bystander").  Similarly, evidence of the uncharged acts of robbery demonstrates the defendants' knowledge of the core money-making purposes of the Six Tre Folk Nation and their intent to participate in them.

Accordingly, evidence of uncharged acts of assaults, murders, robberies, narcotics trafficking and gun possession is not being offered to prove the defendants' bad character or criminal propensity; it is relevant because the government must prove that each defendant knowingly and intentionally conspired to participate in the conduct of the affairs of the enterprise through the pattern of racketeering activity charged in the Indictment, and the testimony of the defendants' former criminal associates is a key part of the government's proof.[8]

IV.    The Other Acts Evidence is Admissible Under Rule 403

Finally, the probative value of the other acts evidence is not substantially outweighed by its prejudicial effect.  Evidence of other crimes is admissible when offered for a proper purpose through the various types of evidence, including the testimony of cooperating witnesses, so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crime[] with which [the defendant has been] charged.'" Pitre, 960 F.2d at 1120 (quoting United States v. Roldan Zapata, 916 F.2d 795, 804 (2d Cir. 1990)).  Where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under the Rule 403 balancing test.  See United States v. Livoti, 196

---

[8]    As noted at pages 35-36 of the government's September 5, 2014 memorandum in opposition to defendant Laurent's omnibus pretrial motion, in addition to the acts set forth here, the government will seek to admit at trial evidence that Laurent has twice resisted efforts to be swabbed, pursuant to a warrant, for a DNA sample.  As set forth in that memorandum, such evidence tends to demonstrate Laurent's consciousness of guilt, and is thus relevant and properly admissible against him.

F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a

police officer charged with engaging in excessive use of force with an arrestee, choked

another arrestee on the basis that "the evidence did not involve conduct more inflammatory

than the charged crime, and the district court gave a careful limiting instruction").

Here, the uncharged criminal acts are either similar in nature or no more

sensational than the charged crimes, which include racketeering, murder, attempted murder,

robbery and use of firearms.  Thus, the uncharged crimes are not more prejudicial than those

with which the defendants are already charged.  In any event, any potential prejudice to the

defendants can be effectively mitigated by a cautionary instruction limiting the jury's

consideration of the evidence to the purposes for which it is offered.  See, e.g., Mickens, 926

F.2d at 1328–29.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the government be permitted to admit the evidence described above at trial.

Dated:       October 3, 2014
             Brooklyn, New York


                                    Respectfully submitted,

                                    LORETTA E. LYNCH,
                                    United States Attorney,
                                    Eastern District of New York


                        By:      /s/
                                 Darren A. LaVerne
                                 M. Kristin Mace
                                 Margaret Lee
                                 Assistant United States Attorneys
                                 (718) 254-7000