UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 11 CR 303

:

-against- :

United States Courthouse
Brooklyn, New York

HAILE CUMMINGS, :

July 30, 2015

Defendant. : 11:00 o'clock a.m.

\- - - - - - - - - - - - - X

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: KELLY T. CURRIE
United States Attorney
BY: KRISTIN MACE
MARGARET LEE
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: MARION SELTZER, ESQ.
1725 York Avenue
New York 10128

Court Reporter: Gene Rudolph
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2538

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: United States versus Cummings.

Counsel, step up, please.

Counsel, please state your appearances.

MS. MACE: Good morning.

Kristin Mace and Margaret Lee for the United States.

MS. LEE: Good morning.

THE COURT: Good morning.

MS. SELTZER: Marion Seltzer for Haile Cummings.

Good morning.

THE COURT: Good morning.

Mr. Cummings is present.

Good morning, sir.

THE DEFENDANT: Good morning.

THE COURT: All right. This is a continuation of a sentencing for Haile Cummings.

Mr. Cummings, are you satisfied with the assistance that your attorney has given you thus far in this matter?

THE DEFENDANT: Yes.

THE COURT: Okay. We have already been through the materials that I already reviewed. There are several additional communications to the Court. I just want to make sure that everyone has seen them.

There is a letter from Ms. Seltzer to the Court dated July 12th.

Have you seen that, counsel?

MS. MACE: Yes, Your Honor.

THE COURT: It includes an attachment of some of the drafts of Mr. Cummings' letter to me that I referenced the last time.

Do you have that?

MS. MACE: Yes.

THE COURT: Okay. I have a letter from the government dated July 15th, which attaches a number of transcripts of telephone conversations between Mr. Cummings and other persons, including his brother and a woman by the name of Kalisha and someone else, Nuggz.

THE DEFENDANT: Yes.

THE COURT: There may be others. And Jabari, is that your --

THE DEFENDANT: That's my brother.

THE COURT: That's your brother.

MS. SELTZER: Your Honor, I believe there was some other --

THE COURT: There is a July 27th letter.

MS. SELTZER: There was also I believe attached to my July 12th letter I believe was a letter from my client. Or was that -- that should have been July 12th. A second letter, the date is June 29th. I have copies.

THE COURT: I have the June 29th letter.

MS. SELTZER: Right.

THE COURT: Have you seen that?

MS. MACE: Yes, Your Honor.

THE COURT: Okay. All right. I think that covers -- do I have everything? I have the July 27th, I mentioned the July 27th letter from Ms. Seltzer.

MS. SELTZER: There was also a letter attached to the catalog of New York City, describing New York City Adult Continuing Education. That was my most recent -- there was also a job offer letter.

THE COURT: Yes. I saw that. I think that was July 27th. It was just the other day.

MS. SELTZER: Yes.

THE COURT: Today is the 30th.

MS. SELTZER: Yes.

THE COURT: Okay. Anything else? I think that covers it. Yes?

MS. MACE: I think that's everything, Your Honor.

THE COURT: All right. Correct me if I am wrong, the parties are in agreement that the total offense level that I should use is a total level 30. Is that right? Is that where we are now? Although the computation from the Probation Department is a 32. I just want to have an understanding.

MS. SELTZER: I believe so, Your Honor, yes.

THE COURT: What is consented to.

MS. SELTZER: It was in the --

MS. MACE: Yes.

MS. SELTZER: It was in the cooperation -- in the plea agreement letter.

THE COURT: In the plea agreement. I don't have to live with the plea agreement.

MS. MACE: Just to be clear, the Probation Department came up with 32. In the government's letter we indicated that appears to be right. However, the government is only seeking a sentence within the guidelines range set forth in the plea agreement, which is 97 to 121, which corresponds to 30 rather than 32.

THE COURT: All right. But my job is to establish the appropriate guideline. Let me say this, I will establish the guideline which I think is correct at 32. But I will sentence based on 30. In other words, I wouldn't sentence above the maximum for guideline 30 but I think I am obligated to determine the correct guideline.

Is there a reason why a 30 is the appropriate guideline?

MS. SELTZER: I don't have anything to add, Your Honor.

THE COURT: All right. The total offense level the Court is finding is a 32. The defendant is in criminal history Category 1. The range of incarceration is 121 to 151 months in the custody of the Attorney General. The

defendant agreed not to appeal or otherwise challenge the sentence I impose if it is 135 months or less pursuant to his plea agreement, which is in the nature of a contract with the government.

But understanding is that the plea agreement estimated a total offense level of 30. I am going to in the handling of the review of the factors under Section 3553(a) of Title 18 of the U.S. Code in order to achieve a sentence that is sufficient but not greater than that necessary to fulfill the purposes of sentencing, I will consider a guideline range of 97 to 121 months as the appropriate guideline, since you agree to it and I see no reason why I should jack it up beyond that. All right. In terms of the analysis.

MS. SELTZER: Yes, Your Honor.

THE COURT: Okay. Which brings us to the next step, and that is to hear from counsel about the appropriate sentence, taking into account all of the factors that are relevant as to Mr. Cummings sentencing.

MS. SELTZER: Do I go first?

THE COURT: You do.

MS. SELTZER: You know, I view this case as somewhat challenging, may not be the correct word, but I think very indicative of not only of Mr. Cummings's situation, which we have been bantering back and forth for the last month or so, but also very analogous to what has been going on in the

newspapers, in Congress and generally throughout this country about the Sentencing Guidelines and what is appropriate for people to be sentenced to, and specifically the plight of young black males in this society.

It is clear, that these guidelines are very high, especially for someone who is 23 years old, who has, as you said, a criminal history of one, which is no criminal history, and who I believe, and I would hope that the Court would agree, has the possibility of leading a law-abiding and productive life.

I look at this in what I conceive of as a positive way and I look at the government as looking at this man as basically having no hope. Because if the Court agrees with the government's analysis, that is, that four years or three to four years in jail is not enough, that somehow putting him away for seven or eight, or as they would like, ten years in jail, that something is going to be accomplished in the next six or seven years by having him sit in a federal correctional institution, then I believe that what is happening here is indicative of the problem as a whole and that merely because the guidelines say ten years and merely because the government says ten years, that that is somehow the correct analysis.

I think that Your Honor hopefully has a deeper understanding of what the background of this man is. Clearly, you sat through that trial. I did not. And I am sure that

you heard some very grisly descriptions of some of the people with whom he associated with and some of the people who he grew up with. That wasn't his choice. That was where he came from. That was the bad part of his background.

The good part of his background is his family, his mother, and his basic intelligence and his attitude, and I would like or hope that Your Honor, and I think Your Honor did look at these letters, which I don't have to quote from because you have read them, but that shows somebody who is contrite and who does want to get on with his life and who at the age of 15 and 16 and 17 left high school and hung out with some very bad people who were down the elevator and on the block from where he lived.

The question is, is there any hope for Haile Cummings. I think if there is hope for Haile Cummings, and I think there is a lot of hope for Haile Cummings, that he will go to the GED program that we have outlined for you, that he will go to a vocational program, that he will get a job, one has been offered, that that together with his familial and his community will enable him to be a good person and not a bad person.

I think it's clear to Your Honor. I mean, I think he is an intelligent fellow. The most impressive -- one of the most impressive parts of our submissions was that letter which you pointed to and I think probably were moved by and I

think the -- I don't know if you had an opportunity to look at the draft transcript that I sent you, but the back of it was interesting. The back of it was a commissary account, a very carefully kept commissary account of everything he bought, everything he spent and added it up and then what he had left to spend. I think what all of it shows is this is a fellow who is not stupid, who has organizational abilities, who has math abilities, who has writing abilities and who has a family who is in a position to help.

So it's -- you know, I can ask you for time served, which the government thinks is ridiculously short but I think is appropriate, or ask you to be compassionate in whatever way you think is appropriate.

THE COURT: Let me hear from the government.

MS. MACE: Thank you, Your Honor.

In our submissions we detailed our general view of this case, but there are some very specific reasons why we believe that a sentence within the range of 97 to 121 is appropriate in this case. I just want to focus on two very specific things rather than repeating anything from our submissions.

First, it is an appropriate goal in sentencing this defendant to protect the community, and that is a real concern in this situation.

This defendant, you need to, we submit, look at what

his role is and was in the gang. He was the gun guy. He was the one who held the guns for the gang members so that they were ready whenever anyone needed them and they came to his house, his apartment, to get those guns and used them in absolutely horrific crimes. That was his main role in the gang. He fulfilled that role. On multiple occasions he supplied those guns that were used in really awful crimes that affected the community.

The community here that I am referring to is the Ebbets Field community and in the trial I think it was clear that there is a unique type of mayhem in that community that is based largely on the presence of guns and a gang, a very dominant gang that had access to the guns. Those guns led to a lot of suffering.

Defense counsel just referred to the plight of young black men. I think it's important also to think about all the young black men living in Ebbets field who were not in the gang, some of whom testified before Your Honor who were victims of the gang's crimes. That is their plight as well.

Part of the goal, we submit this Court should have in sentencing the defendant, is to protect the other people in the community.

In our letter we also detailed some of the violence the defendant himself participated in. He didn't merely supply guns. He also participated actively in the violence.

He was directed on one occasion to carry out a shooting. He set out to do it. It did not occur on that occasion. He and another Six Tre member then did shoot someone in 2008 and we indicated some of the facts of that in our letter.

He also was part of the jewelry store robbery, the Lee Perla Jewelry Store robbery. If you recall, the government presented video that showed really a terrifying scenario where the defendant and others went in, faces covered, smashed the glass, terrified the employees and the other people that were surrounding those -- that crime.

Defense counsel has argued that the defendant is contrite, that he is changed, and that is something that frankly most defendants say at sentencing. Sometimes there is evidence that people have put in the hard work to really make a change in their life and a lasting change and the Court I think has seen evidence from other defendants in this case where that has happened.

We submit, Mr. Cummings is not one of those people. There is no evidence that he has put in that hard work to change his life, to come out and do something different.

Defense counsel has asked what would be accomplished by more time in jail. Our hope is -- we agree, there is hope for Mr. Cummings. The hope is that he will put in that work and change himself, change his life and get a different perspective. It appears that it has not happened yet and the

calls that we submitted are some indication of that. That's why we presented them to the Court.

That's our position with regard to protecting the community.

The second point that we think is important in this sentencing is that it is important to make clear to other Six Tre members that they will be punished significantly if they commit crimes for the gang. This case, we submit, presents one of the starkest examples of an opportunity to really communicate to people who are committing crimes right now and who intend to commit them in the future.

One of the calls that we submitted is a call from the defendant to the Patio at Ebbets Field. He talked to numerous people. He talked to Nuggz, another gang member, his brother, another gang member, JuJu, another gang member. One of the things that they discussed was the sentences that other defendants had received in this case. They went through the list. They discussed the fact that they know how to look up on the Internet how long a sentence people got. They know what sentences Your Honor is giving. Frankly, by tonight everyone on the Patio will know what Mr. Cummings got for a sentence.

They will know either that he got time served for a federal racketeering case, which is approximately 40 months, and it is a racketeering case involving robbery and conspiracy to murder, or they will know that there is a significant

consequence and that the Court will take a person out of commission, make him not able to hurt other people for his most dangerous years, which are right now, and there will be real consequences to committing crimes like this, to being the gun guy, to participating in murder conspiracy. Everyone will know that today, and it is important. We submit that it is extremely important because the next generation is coming up right now and it is clear from the calls that they are listening and they are listening to Your Honor right now.

For those reasons --

THE COURT: Don't you think it is sort of understandable that they would be talking about the sentences that people got, people they know and their friends? They are not talking about committing crimes on the phone. They are going to talk about something that they have in common, and that is, their relationships with their friends and the sentences. Whatever I give someone who is part of a group, it gets around.

MS. MACE: Certainly.

I think that's one of the reasons that general deterrence is set out as a very specific goal of sentencing in 3553(a). Because it does get around and it gets around to family members and people who care, but it also gets around to the gang members and the youngsters in Ebbets Field who look and say, I can do three years on a federal case and come out,

have more street credibility, have more ability to commit crimes, and hardly suffer at all for one of the most serious types of crimes that someone from that scenario can be charged with.

THE COURT: Do you have something else? Is that it?

MS. MACE: That's it, Your Honor.

THE COURT: Anything else? I know. I haven't gotten to Mr. Cummings yet.

MS. SELTZER: It's like is the glass half full or is the glass half empty. There is hope.

THE COURT: The question is, is the past prolog here for his future behavior. I don't think it is any surprise that a Court would look askance at a defendant who would act as the armorer for a violent street gang operating in a housing project. That's exactly what your client was. He was the armorer.

Do you know what the armorer does? The armorer keeps the weapons. When the weapons are needed, the armorer provides the weapons.

MS. SELTZER: But how --

THE COURT: So whether you are 17 or 23 or 43, and you are holding weapons in your possession for other people to use for violent crime, a ten-year old knows the possible consequences, anyone who turns on the television knows the potential consequences of using weapons in the course of

criminal conduct.

I am just wondering how I factor in this particular aspect of your client's past and whether it is prolog or it is just bad judgment that will never occur again.

MS. SELTZER: As I say, you have the benefit of having sat through the trial. I am trying to evaluate what I am hearing from you and from the government from what I know about Haile Cummings, who from my perspective is not a -- personally a violent person but who from my understanding -- granted those acts are bad acts, of holding the guns and hiding them in his mother's closet. But are they in some respects passive. You give him a title and call him whatever that title is, the -- whatever --

THE COURT: The armorer.

MS. SELTZER: The armorer. It is impressive to the extent that maybe amongst that crowd, but when you are 16 or 17 years old and these older guys tell you to do it, the question is, how much did -- granted, he could have said no. Nobody is arguing that what he did he is guilty of. But is it different when you are that age and you are in that position with kids, young men who are older, who you look up to for not the right reasons obviously, because of the situation where a father has been recently been deported from the United States, because he's got a working mother and all those other socio reasons. Your Honor, it doesn't mean that he is hard to the

core or bad to the core.

I would guess that some of these people who will be sentenced by Your Honor to life without parole have no redemptive value whatsoever. I would guess that, although I don't know them. But I would ask Your Honor to look at this person and what you are able to see from the letters and even from -- it's the same crime, to conspire to kill somebody, if you are the guy who took the guns and hid them in your apartment. It's the same conspiracy. But is it the same person who got the guns, who took the guns and who ran around and tried to shoot somebody?

That's a qualitative decision, Your Honor. I don't think he ever became that bad guy and I think he told you and I think he told you honestly that he's almost grateful that he got pulled out and that he had these last three or so years to think about his life and to think about what he wants to do with his life. You could either believe him or not believe him.

THE COURT: There is nothing in these phone conversations that would lead me to believe that he's changed at all, frankly. Forget the letter, which is self-serving, that he sent me and the second letter. Because he knows where I am coming from on the first letter because I told him. I think he's very intelligent. I think he's very well spoken. He's very articulate.

But when he is talking to the guys and gals on the street, it is the same old stuff. There is nothing there. There is nothing that I can see that tells me that he's saying, I don't want to have nothing to do with this no more, I am not getting involved, don't bother me, you got me into this, and now I'm screwed.

He didn't say that. That's not there.

MS. SELTZER: Well, I think -- I'm sorry.

THE COURT: Let me finish.

It is just not there. So I've got his self-serving statement. I've got your advocacy and I've got the fact that he's talking in street tongue to the people who, if I let him out tomorrow, he is going to be back with them. What good is that? What does that mean in terms of his intentions?

MS. SELTZER: Perhaps he could better --

THE COURT: Well, maybe he could.

What I'm telling you is, that when I wasn't looking, that's what he was doing, when I wasn't looking. When I am looking he sends me some very nice mail. I complimented him on his efforts already. I did that once.

I got a letter from his mother, who is terrific, who worked very hard on his behalf, and he still held guns for these people. I don't know that having her in the picture is going to make any difference at all to his future conduct, despite her very best efforts and the fact that she is a hard

working person who has done good things for her family during her lifetime. I appreciate what she wrote to me, believe me.

That's my problem. My problem is, he's the problem.

MS. SELTZER: I hear you.

THE COURT: His behavior is the problem. And his association with that group is the problem. The fact that he goes back and he is still ingratiating himself with the people out there, that's a problem. He knows he is being recorded. It's right on the phones at the MDC. It says, your conversations can be recorded or may be recorded, whatever it says. So he knows. He doesn't care.

MS. SELTZER: Well, the --

THE COURT: That's what I am facing in considering whether to give him a guideline sentence or not. That's what I am facing.

MS. SELTZER: I hear what you are saying. I am not totally familiar with every line in those conversations. But I thought and I thought Haile referenced certain parts where he -- he's not going back and he intends to get a job and I mean, I -- I don't understand half of the language in gangsta rap music or half the language or what it means in these conversations. I believe what we interpret as bad is sometimes --

THE COURT: I don't think it is bad. I just think it is expected.

MS. SELTZER: I think it's the way they talk. I mean, I have seen people who don't come from that background, from nice upper middle class communities, where I know people Haile's age who talk in that same -- this awful talk. It's endemic in that age group, and I suggest, Your Honor, that the government interprets every -- the use of the word gangsta and the use of other language as indicating that he intends to go back. I just don't think that is what he intends and I don't think that's what he means.

I mean, I can look through his letter here, where he in his letter to you made certain references to other parts of the conversations, where he says no, I am going to get a job and no, I would -- I would like to get out of the neighborhood and things to that effect.

But when -- he is calling his brother, he's calling these girls. They are all from Ebbets Field. Those are the people he knows and that is the way these people talk.

I am not sure that the government -- I understand that they interpret everything in a negative way. But I am not sure they are correct, Your Honor. I am just -- I am just suggesting that that's the way these young people talk and especially when he's talking to these people who he knew from that milieu. It is not saying, I am going back. I am going to do it again. It is just the way they talk. If you listen to any gangsta rap music, that's --

THE COURT: I do.

MS. SELTZER: I don't like it.

THE COURT: In this courtroom.

MS. SELTZER: Well, I don't like it and I bet you don't like it either. But that's the way they talk.

THE COURT: There are all kinds of music in the world. I am not going to disparage --

MS. SELTZER: Frank Sinatra.

THE COURT: You listen to Frank Sinatra.

MS. SELTZER: I do.

THE COURT: Anything else from you? Then I want to hear from the defendant.

MS. MACE: Thank you.

I would like to be clear so the record is clear. We have not made any arguments based on any style of speech or comments or anything like that. We have pointed to specific things the defendant actually said.

Ms. Seltzer referred to the part of the recording where the defendant's brother looked gangsta. But why we pointed that out is because of the other names that are referenced there. There is a reference to Gunny and there is a reference to Devon Rodney and there is a reference to the defendant's brother, all members of the gang. That provides context for the discussion that's going on there. That was the purpose of the government's highlighting that.

Also, with regard to the --

THE COURT: But referencing some of the other defendants doesn't necessarily serve as an effort to validate what they did, does it?

MS. MACE: The reference itself does not but what comes rights after it does. When the defendant -- there is the discussion of Six Tre Day and we have included all the conduct there to make that clear.

THE COURT: I know about Six Tre Day.

MS. MACE: Then the defendant affirms this and shows that he is still committed to it by saying, shit is everlasting, you heard immortal, shit is never die. You heard. And if you listen to it you can hear he is emphatic. He is saying, this gang is immortal. Look at us, we are strong.

We have presented the disk to Your Honor and to defense counsel because if you listen you can hear in the tone how emphatic the defendant is about -- in the statement in his letter that he is talking about himself, that he's immortal in the community. I just don't think that makes any sense. Especially if you listen to it, it doesn't.

THE COURT: Okay. Anything else?

MS. MACE: I'm sorry. Just one other note.

THE COURT: Go ahead.

MS. MACE: Defense counsel argued that the tapes say

he intends to go out and get a job. I think that's another instance where it's really important to listen to the recording itself. Because it is Kalisha who says you are going to be working when you come home. You are going to be out of the mix. Then if you hear the defendant he sort of chuckles and says, kind of, sort of. Something like that.

She gets mad at him and says don't play with me, Haile. And he says so smartly, that's a fact. If you listen to the tone in that, I think it's the opposite meaning of what defense submits. It's not he is saying he is going get a job. He is laughing at the notion of getting a job. Something like that. He is going to go back to the life. When you listen to the tone in his voice I think that's what is communicated.

THE COURT: All right. Anything else?

MS. SELTZER: Well, I don't know. I really don't have a sense of where Your Honor is thinking. But isn't there some way that he could be on supervised -- a strict supervised release, that he has to get a job, that he has to go to school, that he is not allowed to associate with certain people and that if he does it is a violation.

If there is some way to fashion that kind of a sentence, then he is not going out to shoot people and kill people and beat up people, I would suggest, because he never did that. So he would be violated and --

THE COURT: He did participate in an extremely

violent act at the jewelry store and we saw the security -- maybe you haven't seen it.

MS. SELTZER: I haven't.

THE COURT: I have seen the security surveillance video and it scared the life out of everybody who was there when these people came in with their masks and started using a sledgehammer or whatever kind of hammer it was on the display cases and taking all the valuable watches out of the store. That's pretty violent. That's not just picking up $10 off the street and walking away with it.

MS. SELTZER: I am not -- I didn't see the video. I don't know what role he played.

THE COURT: I assure --

MS. SELTZER: He pled guilty and he went --

THE COURT: I understand that. I am just saying that when you talk about -- he is not a killer. He has been violent and he has stored guns. Guns tip the scales sometimes in a direction you would not be too happy about.

Anything else then?

MS. SELTZER: Not from me.

THE COURT: I can hear from the defendant.

Mr. Cummings, is there anything you would like to say before I sentence you?

THE DEFENDANT: I would just like to say that I fully understand that everything I did in the past was -- was

not called for and I understand -- I take full responsibility for that. I just want to go -- I just want to go home to work, go to school. I don't -- I am not trying to associate with the gang when I go home. I just want to be with my family. That's -- that's -- that's it. I don't think -- I was a kid when I did all this and I -- I regret it, yes. But I am just trying to work -- work on the future and I believe I changed drastically and I am just -- I just want to be -- I want to show the Court and my family that I have changed. I am not the same person I was then.

I think that's it.

THE COURT: Mr. Cummings, you have been a participant in an extremely violent street gang, the Six Tre Folk Nation and this organization has traumatized an entire community, the Ebbets Field Houses and the surrounding area. It has engaged in rather extreme acts of violence, much of which you had nothing to do with, I will state very clearly. I wouldn't want anyone to think that I am going to hold you responsible for acts of violence that other people engaged in.

But you were also a facilitator because you stored weapons for the organization for a time and the Court is very concerned about many of the considerations that the government has made regarding the factors under the sentencing law, Title 18, U.S. Code, Section 3553(a), having to do with the factor of deterrence of this kind of conduct by others, as

well as the issue of the appropriate level of punishment for you, quite part from other considerations.

I think that your age obviously speaks in favor of some sort of adjustment of the sentence below the guideline, and I think it is worth commenting that it appears that when you finish your sentence you will have the opportunity to get a job. I think you are very smart. I think you have a supportive family. I think the punishment you might get from your mother will be greater than any punishment you get from me. Because you deserve it because of what you have done to her and your family.

I think other members of your family have found ways of leading law-abiding lives, notwithstanding the fact of where they grew up. I don't buy, frankly, that somehow you were compelled to partake in the activities of Six Tre because you happened to be there. I'm sure there are lots of young men who don't and maybe they are victimized but they need to come forward and this kind of behavior needs to be stifled.

You didn't do anything to help your community by storing guns for these individuals who will use them to hurt or kill people, as we have seen. So I am not terribly sympathetic to you because you happen to live in a difficult place and then you sort of gave in because you were a kid and you were going to store guns for people. They might have found somebody else. Maybe they should have stored them

themselves but they were cowards too. That is cowardice on their part, to put it on somebody else, who is younger than they are or more vulnerable than they are. So what they are doing is cowardly and you shouldn't succumb to their cowardice. That's water under the bridge.

On the other hand, it says something about you. What it says is that, to me, what's going to happen the next time they come to you and they want you to do something, whether you have the presence of mind and the fortitude to do what you say you are going to do. That's a real issue for me.

Sentencing is my most important and most difficult job as a judge. There is nothing more important than that, nothing more difficult than that. I have spent hours thinking about it. I spent all of yesterday thinking about your case and rereading what had been submitted to me. Coming up with a number, there is no crystal ball from which you get a number. That's why I take this much time to sentence someone. I could have sentenced you in 15 minutes, having read all this material, heard from the lawyers and off I go and off you go.

But it is important to me, frankly, that if your life can be turned around by you, if I think that that's a possibility, that notwithstanding all the other issues, and I agree with the government on everything they said, by the way, about the impression that you conveyed on those recordings. So words mean something. Words mean something and the way you

say things means something. The context means something. It all means something.

If you go back out there when you get out of prison and you are trying to be one of the group again, at some point you are going to screw up and you will be back in court and you could spend the rest of your life in one way or another dealing with the criminal justice system. That would be a tragedy for you and your family, and if you could do something to make things better in your community, for your community, because it will be a lost opportunity.

Now, it sounds like a lecture but I don't really know any other way to convey upon you the fact that if all of your statements and your promises and your remorse to the extent you have it is a charade or a facade and it is really just to get out of here and back on the street, you are coming back. You are only fooling yourself. If you fool me, that's one thing. If you fool yourself, that has real consequences.

I say all of this so that when I sentence you, if anyone asks you why you didn't get a 97-month sentence, the answer is, you didn't get a 97-month sentence because the judge decided to give you a challenge. The challenge is, to turn your life around, lead a law-abiding life, get with the program, listen to your mother and your family. That's what the judge wants to happen.

You will see from the sentence that I give you, if

you don't do that, look at these four walls. You will be back here with me and I will not be terribly enthusiastic about your return.

Are you ready to be sentenced?

THE DEFENDANT: Yes.

THE COURT: All right. I am going to grant the downward departure from the sentencing guideline range of 97 to 121 months in the custody of the Attorney General.

I impose a sentence of 54 months in the custody of the Attorney General; three years of supervised release with the following special conditions:

For a period six months, the defendant shall comply with a curfew via electronic monitoring directed by the US Probation Department. The defendant will remain at his or her place of residence from 7:00 pm to 7:00 am. The Probation Department may designate another 12-hour respective time period if the defendant's employment, education or observance of religious services preclude the above specified times. The curfew via electronic monitoring shall commence on a date approved by the Probation Department. During the curfew period, the defendant shall wear an electronic monitoring bracelet or similar tracking device and follow all requirements and procedures established for the curfew via electronic monitoring by the Probation Department. In addition, the defendant shall pay all costs, including the

price of electronic monitoring equipment, to the degree he is reasonably able. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay.

The defendant shall not possess a firearm, ammunition or destructive device.

The defendant shall submit his person, property, house, residence, vehicle, papers, computers, other electronic communications or data storage devices or media, or office to a search conducted by the United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct the search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contained evidence of that violation. Any search must be conducted at a reasonable time and in a reasonable manner.

The defendant shall not associate in person, through mail, telephone, or electronic communication, with any individual with an affiliation to any organized crime groups, gangs, or other criminal enterprise pursuant, but not limited to, a prohibition list proceeded by the US Probation Department, nor shall the defendant frequent any establishment

or other locale identified by the Probation Department as a location where these persons may meet.

I am imposing a $100 special assessment which is mandatory.

I am not imposing a fine as you do not appear to have the ability to pay a fine.

You have the right to appeal your sentence to the US Court of Appeals for the Second Circuit if you believe the Court has not properly followed the law in sentencing you. Your time to appeal is extremely limited. You should discuss with your attorney at once whether an appeal would be worthwhile. I note again that you agreed in your plea agreement not to appeal or otherwise challenge the sentence that I impose upon you if it is 135 months or below. Therefore, by contract with the government, it would appear that your ability to appeal is foreclosed. But you should discuss with counsel immediately whether that is so or whether you wish to appeal.

I also admonish you that returning to the Ebbets Field Houses is an act that is filled with danger for you because it could result in conduct that you might think is unavoidable but I may think is a violation. So when considering where to live upon the completion of your sentence, you should bear in mind that the last place in the world you want to be is the Ebbets Field Houses.

But wherever you live, you are subject to six months of a curfew via electronic monitoring. I remind you about that as well.

Are there open counts or underlying indictment?

MS. MACE: Yes. Both underlying indictments and open counts, I believe. So --

THE COURT: The open counts on Count Three -- three to 15, 17 to 21. Correct? And one? No. One --

MS. MACE: One he pled to.

THE COURT: He pled to one, and two and six were open.

MS. MACE: The government --

THE COURT: Two to 16.

All open counts are dismissed on motion of the government.

MS. MACE: Yes, please.

THE COURT: All underlying indictments are dismissed on motion of the government. Is that right?

MS. MACE: Yes.

THE COURT: Yes. Motions granted.

Yes?

MS. SELTZER: Thank you, Judge.

I would also ask that if you would recommend that he be sentenced to serve his sentence at a -- I don't know if it is an FCI or --

THE COURT: Whatever it is. Wherever it is.

MS. SELTZER: It's in Fairton, New Jersey. There is a barber shop, a barber program there.

THE COURT: I would recommend, but I cannot require, that the Department of Justice Bureau of Prisons designate the defendant to the Fairton facility so that he can pursue a program to learn barbering skills.

MS. SELTZER: Thank you.

THE COURT: All right. Anything else from the government for today?

MS. MACE: No. Thank you, Your Honor.

THE COURT: Anything else from the defense?

MS. SELTZER: No, Judge.

THE COURT: Good luck, sir.

THE DEFENDANT: Thank you.

(Matter concludes)